# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MARSEILLES DEMOND WOODLEY,

        Defendant-Appellant.

UNPUBLISHED
June 16, 2015

No. 320630
Wayne Circuit Court
LC No. 13-009379-FC

Before: SAAD, P.J., and M. J. KELLY and SHAPIRO, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree premeditated murder, MCL 750.316(1)(a), assault with intent to murder, MCL 750.83, possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, and felon in possession of a firearm (felon-in-possession), MCL 750.224f. Defendant was sentenced to life imprisonment without parole for first-degree murder, 45 to 90 years for assault with intent to murder, two to five years for felon-in-possession, and two years for felony-firearm. We affirm.

This case arises out of the September 10, 2013 shooting of Robert Barnes and Adrian Nelson in Detroit. Testimony established that Barnes was shot at least eight times and died from his injuries. Nelson, who testified at trial, was shot once and survived a "graze" wound.

Nelson testified that he, Barnes, and defendant had been friends for 10 to 15 years. On the date in question, Barnes, Nelson, defendant, and other friends gathered in the area of Holbrook and Beaubien Streets for a wake of sorts, sharing drinks and conversation after the death of a friend. Nelson stated that some people were drinking vodka and that Barnes and defendant drank from the same bottle. When the bottle was empty, Barnes threw it into the yard of 504 Holbrook, which was vacant at that time, but at one point had apparently been the home of defendant's grandmother. Nelson testified that defendant became upset and asked Barnes why he was disrespecting his grandmother's house. Barnes responded that it was nothing but a bottle, and an unidentified person picked up the bottle and threw it into a trash can. According to Nelson, this did not calm defendant and he remained upset about Barnes throwing the bottle.

Nelson further stated that, after about five minutes of argument between Barnes and defendant, defendant pulled out a handgun from the passenger side of his truck. Nelson heard a shot, turned around, and saw the gun in defendant's hand, pointed at Barnes's legs. Nelson stated that Barnes was on the ground and cried out, "Man, I'm sorry. I apologize. I apologize."

-1-

Nelson stated that it did not appear that Barnes had been shot at this point. He testified that Barnes continued to apologize to defendant and that, during this altercation, all of the other gathered individuals left the area except Nelson and another unidentified male. Nelson testified that he paced the street, asking defendant not to shoot Barnes.

Nelson stated that, after approximately five minutes, defendant called him from across the street and requested that he get Barnes's car keys and remove Barnes from the area. Nelson, thinking everything was "cool" and that defendant was going to release Barnes, walked across the street and reached out to pick up Barnes's keys. Nelson testified that, as he did so, he was shot in the back of the head, which resulted in the aforementioned "graze" wound. Nelson stated that he immediately ran from the scene until he flagged down someone he knew, who then transported him to the hospital. Nelson testified that, as he ran, he heard six or more gunshots, which sounded to him as though they came from the same gun that had been fired at him.

## I. JURY CHALLENGES

Defendant argues that the prosecutor violated his equal protection rights by improperly excusing prospective jurors during jury selection on the basis of race.

"[A] party may not exercise a peremptory challenge to remove a prospective juror solely on the basis of the person's race." *People v Knight*, 473 Mich 324, 335; 701 NW2d 715 (2005), citing *Swain v Alabama*, 380 US 202, 203-204; 85 S Ct 824; 13 L Ed 2d 759 (1965). To do so violates the Equal Protection Clause of the Fourteenth Amendment. *Id*. "[This] error occurs when a juror is actually dismissed on the basis of race or gender. It is undisputed that this type of error is of constitutional dimension and is subject to automatic reversal." *People v Bell*, 473 Mich 275, 293; 702 NW2d 128 (2005). In *Batson v Kentucky*, 476 US 79; 106 S Ct 1712; 90 L Ed 2d 69 (1986), the United States Supreme Court detailed a three-step analysis for considering a claim of constitutional violation by way of a peremptory challenge based on race, which the Michigan Supreme Court outlined in *Knight*:

> First, the opponent of the peremptory challenge must make a prima facie showing of discrimination. To establish a prima facie case of discrimination based on race, the opponent must show that: (1) he is a member of a cognizable racial group; (2) the proponent has exercised a peremptory challenge to exclude a member of a certain racial group from the jury pool; and (3) all the relevant circumstances raise an inference that the proponent of the challenge excluded the prospective juror on the basis of race. The United States Supreme Court has made it clear that the opponent of the challenge is not required at *Batson's* first step to actually prove discrimination. Indeed, "so long as the sum of the proffered facts gives 'rise to an *inference* of discriminatory purpose,' " *Batson's* first step is satisfied.

> Second, if the trial court determines that a prima facie showing has been made, the burden shifts to the proponent of the peremptory challenge to articulate a race-neutral explanation for the strike. *Batson's* second step "does not demand an explanation that is persuasive, or even plausible." Rather, the issue is whether the proponent's explanation is facially valid as a matter of law. "A neutral

explanation in the context of our analysis here means an explanation based on something other than the race of the juror. . . . Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."

Finally, if the proponent provides a race-neutral explanation as a matter of law, the trial court must then determine whether the race-neutral explanation is a pretext and whether the opponent of the challenge has proved purposeful discrimination. It must be noted, however, that if the proponent of the challenge offers a race-neutral explanation and the trial court rules on the ultimate question of purposeful discrimination, the first *Batson* step (whether the opponent of the challenge made a prima facie showing) becomes moot. [*Knight*, 473 Mich at 336-338 (citations omitted).]

"Before a reviewing court can determine which standard of review applies for purposes of *Batson*'s three steps, the court must first ascertain what the trial court actually ruled." *Id*. at 338. If we must consider whether defendant has satisfied his burden of demonstrating a prima facie case of discrimination, step one, we review the trial court's underlying factual findings for clear error and any questions of law de novo. *Id*. at 345. If we must consider whether the prosecution properly articulated a race-neutral explanation as a matter of law, step two, we review that explanation de novo. *Id*. Finally, if we must consider whether the trial court's determination of whether the race-neutral explanation is pretextual and whether defendant has proved purposeful discrimination, step three, we review the trial court's ruling for clear error. *Id*.

It is unclear which step of the test defendant challenges. Moreover, the trial court did not "methodically adhere" to the three-step test to decide defendant's challenge. *Id*. at 338-339. Therefore, we "must determine on the basis of a fair reading of the record what the trial court has found and ruled." *Id*. at 339. Because the prosecutor provided an explanation of her challenges and the trial court ruled on the ultimate question, the issue of whether defendant made a prima facie showing under step one is moot. See *id*. at 338. Thus, we need only consider steps two and three of the *Batson* procedure.

As to step two, the prosecutor proffered race-neutral explanations for all of her peremptory challenges. The prosecutor explained that she challenged an African-American female because this potential juror stated that it would be a financial hardship for her to serve on the jury. She explained that she challenged an African-American male because "he had an issue with police officers because the police shot and killed his neighbor, and he further indicated that he had a family member who had been convicted of homicide." She explained that she challenged a second African-American male because his brother had been convicted of homicide and he stated that he "had a bad feeling" about police due to that experience. Finally, the prosecutor explained that she challenged another minority female because she had "indicated she had very bad feelings toward law enforcement in general," including making statements that her cousin was convicted of a crime because the witnesses, police, and prosecutors lied. The prosecutor's explanations were satisfactory because they were "based on something other than the race of the juror." *Id*. at 337.

Thus, we must consider whether the trial court's acceptance of these race-neutral explanations constituted clear error on the basis of the record and the persuasiveness of the prosecutor's explanations. *Id*. at 339, 343 n 12. We conclude that the trial court did not clearly err.

There is no basis in the record to question the credibility of the prosecutor's explanations or the trial court's rulings. Ill feelings towards police, like those expressed by the final three challenged potential jurors, is an acceptable race-neutral ground for dismissal. See, e.g., *United States v Ferguson*, 23 F 3d 135, 141 (CA 6, 1994). There is also no indication that the prosecutor's explanation with regard to the first juror, who was excused due to the difficulty of providing for her four children while serving on a jury, was pretextual.[1] Dismissal due to childcare issues, so long as they are detailed on the record, does not establish discrimination. *People v Armstrong*, 305 Mich App 230, 238-239; 851 NW2d 856 (2014). Finally, there is no evidence that the prosecutor failed to challenge the presence of other, nonminority potential jurors who possessed similar ill feelings towards police, close connections to violent crime, or childcare issues. See *Miller-El v Dretke*, 545 US 231, 241; 125 S Ct 2317; 162 L Ed 2d 196 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step.").

In sum, defendant has failed to present evidence to establish that the prosecutor's otherwise proper race-neutral reasons for excusing the challenged jurors were pretextual and, accordingly, his *Batson* challenges fail.

## II. SUFFICIENT EVIDENCE

Defendant argues that the prosecution presented insufficient evidence to allow the jury to find him guilty of first-degree premeditated murder.[2]

> In ascertaining whether sufficient evidence was presented at trial to support a conviction, this Court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. A reviewing court is required to draw all reasonable inferences and make credibility choices in support of the trier of fact's verdict. [*People v Strickland*,

---

[1] To complicate the matter, the trial court indicated that this juror expressed that she had lost a relative to homicide, an explanation not proffered by the prosecutor. The cause for this confusion is likely that another potential juror with the same last name was excused by defendant, not the prosecution, and this other individual indicated that he had lost a relative to homicide. Nonetheless, without more, there is no reason to find that the prosecutor's dismissal of the potential juror challenged on appeal was pretextual.

[2] Whether a defendant's conviction was supported by sufficient evidence is reviewed de novo. *People v Harverson*, 291 Mich App 171, 177; 804 NW2d 757 (2010).

293 Mich App 393, 399; 810 NW2d 660 (2011) (quotation marks and brackets omitted).]

To sustain a first-degree murder conviction, the prosecution must prove that the "defendant intentionally killed the victim and that the act of killing was premeditated and deliberate." *People v Ortiz*, 249 Mich App 297, 301; 642 NW2d 417 (2001); see also MCL 750.316. The jury may reasonably infer premeditation and deliberation from evidence of the circumstances surrounding the killing. *Ortiz*, 249 Mich App at 301. "Minimal circumstantial evidence is sufficient to prove an actor's state of mind." *Id*. To establish premeditation and deliberation, we consider factors such as the prior relationship of the defendant and the victim, the defendant's conduct before and after the killing, and any other circumstances surrounding the killing that may be relevant, including the weapon used and the wounds inflicted. *People v Plummer*, 229 Mich App 293, 300-301; 581 NW2d 753 (1998). The time required for premeditation and deliberation is the time that is sufficient for the defendant take a "second look." *People v Gonzalez*, 468 Mich 636, 641; 664 NW2d 159 (2003).

On appeal, defendant only argues that the prosecution failed to present sufficient evidence to allow the jury to identify him as Barnes's shooter. The identity of the defendant is an essential element of every crime. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). In reviewing the evidence in the light most favorable to the prosecution, if a rational juror could have found the prosecutor established the defendant's identity beyond a reasonable doubt, then sufficient evidence of identity exists. *People v Nowack*, 462 Mich 392, 399-400; 614 NW2d 78 (2000).

The prosecution presented sufficient evidence to allow the jury to find that defendant committed first-degree premeditated murder. Nelson testified that he overheard an argument between defendant and Barnes, saw defendant retrieve a gun from a car, heard a shot, saw defendant point a gun at Barnes, and saw Barnes lay down on the ground. Nelson testified that defendant called him over to presumably pick up Barnes's keys and remove Barnes from the area, but instead, defendant shot Nelson in the back of the head. As Nelson ran away injured, he heard several shots, which sounded as though they came from the same gun that shot him. The medical examiner testified that Barnes sustained at least eight gunshot wounds. Derrick Corbin testified that he saw Barnes laying face-down on the ground, dead. The evidence regarding defendant's actions of luring Nelson to get the keys and shooting Barnes at least eight times indicate premeditation. The issue of identity was wholly a credibility issue for the jury to resolve. If it believed Nelson, which it apparently did, then defendant would be found guilty, and we defer to the credibility findings of the jury. *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013). Consequently, defendant's challenge to the sufficiency of the evidence supporting his first-degree murder conviction fails.

## II. PROSECUTORIAL MISCONDUCT

Defendant claims that various statements made by the prosecutor amounted to misconduct sufficient to require a new trial.[3]

"[T]he test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). We must review the record and evaluate the challenged remarks in context. *People v Mann*, 288 Mich App 114, 119; 792 NW2d 53 (2010). The appropriateness of a prosecutor's remarks depends on the specific facts of the case, *People v Rodriguez*, 251 Mich App 10, 30; 650 NW2d 96 (2002), and comments must be read as a whole and evaluated in the light of defense arguments and the relationship they bear to the evidence admitted at trial, *People v Brown*, 279 Mich App 116, 135; 755 NW2d 664 (2008).

First, defendant argues that the prosecutor improperly vouched for Nelson's credibility in voir dire and closing argument. Defendant argues that the prosecutor's comment in voir dire, "[i]n this case we got one person that was brave enough to step forward and say this is what I saw," amounted to improper vouching. Defendant also asserts that the prosecutor improperly vouched for Nelson in closing by reminding the jury that it had to decide if Nelson was lying:

> I submit to you that he's not lying. That he's telling you the truth. When he came into court and told you that it was the defendant that tried to kill him and did in fact kill Robert Barnes.

> * * *

> We know that he calls the police. He's interviewed by the officer-in-charge of this case, James Kraszewski [sic]. He testifies at an interview with me on September 17, 2013. He testifies at a [p]reliminary [e]xamination before a [j]udge, and he testified here in court last week.

> He says the same thing. Once he comes clean, he tells the same story every time that he testifies. It's up to you to decide whether or not he's telling you the truth and whether or not he has been consistent or inconsistent in telling of what happened.

---

[3] Generally, we review claims of prosecutorial misconduct de novo "to determine whether the defendant was denied a fair trial." *Dunigan*, 299 Mich App at 588. However, because defendant did not object to the challenged statements at trial, our review is limited to plain error affecting substantial rights. *People v Gibbs*, 299 Mich App 473, 482; 830 NW2d 821 (2013). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings." *People v Meissner*, 294 Mich App 438, 455; 812 NW2d 37 (2011).

I submit to you that from the moment that the decided he was going to come clean and tell the truth, that he has been truthful, and he gives you the reasons why he doesn't initially tell the truth.

\* \* \*

But once he realizes the seriousness of what's happened to his friend, shot nine times, he feels an obligation to feel responsible. That he has to tell the truth and so he does.

A prosecutor may not vouch for the credibility of her own witnesses "by suggesting that [s]he has some special knowledge of the witnesses' truthfulness." *People v Seals*, 285 Mich App 1, 22; 776 NW2d 314 (2009). However, defendant has identified no statements of the prosecutor that rise to the level of misconduct. Defendant has taken the prosecutor's first statement out of context. In voir dire, the prosecutor was attempting to determine whether prospective jurors could accept that, although there were allegedly multiple witnesses to the crime, only Nelson would be testifying in support of the case. The prosecutor was not suggesting that Nelson was to be believed because he was brave. As to her closing, the prosecutor properly argued to the jury, based on the evidence presented, that Nelson was credible. The prosecutor did not indicate that she had some special knowledge of the matter or rely on the prestige of her office at any point throughout the proceedings.

Second, defendant argues that the prosecutor committed misconduct by failing to correct Nelson's false testimony. Specifically, defendant alleges that Nelson falsely testified at trial because, during the preliminary examination, he testified that he saw defendant "jump out and shoot [Barnes]," but at trial, testified that he saw defendant shoot at the ground. Defendant appears to argue that the prosecution presented conflicting testimony. However, a review of the record belies this assertion. At the preliminary examination, Nelson testified that he saw defendant jump out of the car. At trial, Nelson testified, "I see [defendant] jumping out the passenger side of his truck with the gun." He further testified at trial that he heard a shot and saw defendant with the gun pointed down toward Barnes's legs. Nelson clarified on cross-examination that he saw defendant shoot at Barnes but was unsure whether the shot hit the ground or Barnes's leg. In sum, Nelson was simply being more precise at trial than at the preliminary examination. There is no indication that Nelson testified falsely at trial, and, accordingly, the prosecutor had no obligation to correct his testimony.

Third, defendant argues that the prosecutor committed misconduct by misstating material evidence in closing. "Generally, prosecutors are accorded great latitude regarding their arguments, and are free to argue the evidence and all reasonable inferences from the evidence as they relate to their theory of the case." *Id*. Specifically, defendant argues that the prosecutor stated that Nelson's testimony was consistent with that of Markeyla Robinson, a witness who drove by the events and testified that she heard an argument between a man and a woman. Defendant argues that the prosecutor misrepresented Nelson's testimony because he never testified that he heard an argument between a man and a woman and Robinson was the only witness to testify to that effect. Defendant argues that the prosecutor also misstated the testimony of Corbin, who lived approximately one block from the shooting, by telling the jury that Corbin testified to what he saw, while Corbin was adamant that he did not see anything.

Defendant mischaracterizes the prosecutor's arguments. The prosecutor did not argue that Robinson's testimony regarding a man and woman arguing was consistent with Nelson's testimony that defendant and Barnes argued. Rather, the prosecutor argued that Robinson's testimony was consistent with Nelson's testimony that there were 10 to 15 people at the scene, including men and women. Defendant also mischaracterizes the prosecutor's argument regarding Corbin's testimony. The prosecutor argued, "[i]n terms of Mr. Corbin, he indicates to you I only can tell you what I saw. And what I saw is that there was this series of shots, and I look out, and there's nobody out there because why? Everybody at this point has fled. Everybody is gone, consistent with what [Nelson] says." This was a fair characterization of Corbin's testimony. While Corbin did not *see* any shots fired, he testified that *heard* at least nine or 10 shots and, when he looked outside, saw no one present. While the prosecutor could have more clearly indicated that Corbin stated that he heard, and did not see, the shots, we cannot conclude that this minor mistake constitutes prosecutorial misconduct.

Fourth, defendant argues that the prosecutor improperly injected personal opinions and inflammatory remarks that were highly prejudicial in her opening statement and closing argument. Specifically, defendant takes issue with the following comment from her opening statement:

> In this case I believe that every one of the bullets, every time that trigger was pulled is evidence of premeditation and deliberation because it requires, you're going to hear in a regular handgun, it requires a pull of the trigger for every bullet that comes out, and in this case there were nine separate bullets into the body of Mr. Barnes.

Defendant cites the following comments from the prosecutor's closing:

> Now I submit to you that this, the shooting of Mr. Barnes, is personal. This isn't simply a robbery of some keys by Mr. Nelson.

> If that was the case, you would have maybe one or [two] shots. What this is [is] something else entirely. This is personal. Look at all the shots and where those shots are.

> * * *

> The defendant literally killed Mr. Barnes like a dog in the street, and that's the testimony that you heard that Mr. Barnes comes to ultimately die in the street.

> * * *

> Well, the best that we can tell this really happened over a liquor bottle. Now whether or not there was some other underlying hostilities between these two, I don't know, but it certainly seems personal.

> * * *

> Nobody wants to be there because there's some crazy guy with a gun.

-8-

A prosecutor commits misconduct when she injects inflammatory language in order to appeal to the fears and prejudices of the jury. *People v Cooper*, 236 Mich App 643, 651; 601 NW2d 409 (1999). However, after reviewing the record, including the comments cited by defendant, we conclude that the prosecutor's remarks were within the bounds of normal opening and closing arguments and presented no commentary asking the jury to consider issues broader than defendant's guilt or innocence as to each element of the charged crimes.

Moreover, even if any of the prosecutor's challenged remarks were improper, the trial court instructed the jury that the attorneys' statements were not evidence. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003). Accordingly, defendant cannot establish plain error affecting his substantial rights on the basis of the prosecutor's challenged comments.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that he was deprived of the effective assistance of counsel due to his trial counsel's failure to (1) object to alleged instances of prosecutorial misconduct, (2) present allegedly material evidence, (3) properly impeach the testimony of Lela Smith, and (4) properly prepare to cross-examine Nelson.[4]

The right to the effective assistance of counsel is guaranteed by the United States and Michigan constitutions. US Const Am VI; Const 1963, art 1, § 20; *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039, 80 L Ed 2d 657 (1984); *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010). "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise." *Swain*, 288 Mich App at 643. "To prove a claim of ineffective assistance of counsel, a defendant must establish that counsel's performance fell below objective standards of reasonableness and that, but for counsel's error, there is a reasonable probability that the result of the proceedings would have been different." *Id.*

First, defendant argues that counsel was ineffective for failing to object to the previously discussed alleged instances of prosecutorial misconduct. However, as discussed, none of the prosecutor's comments amounted to misconduct. Accordingly, any objection would have been futile and counsel is not ineffective for failing to raise meritless objections. *People v Eisen*, 296 Mich App 326, 329; 820 NW2d 229 (2012).

Second, defendant argues that counsel was ineffective for failing to present material evidence in two instances. First, defendant argues that counsel failed to present the jury with information from the police investigators' report stating that a 911 caller identified a black male

---

[4] "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "Findings on questions of fact are reviewed for clear error, while rulings on questions of constitutional law are reviewed de novo." *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

wearing a white shirt and a white hat as Barnes's shooter. Defendant argues that this failure was outcome determinative because Smith, Barnes's aunt, testified she saw defendant wearing a black hat three hours prior to the shooting. Second, defendant argues that counsel was ineffective for failing to emphasize that Nelson's version of events would have revealed 11 shots fired or 11 shell casings at the scene, when in fact only 10 shell casings were recovered.

Counsel's decisions not to question witnesses about the color of the hat defendant wore nor highlight the discrepancy in the number of shots fired were matters of trial strategy, which we will not second guess unless the strategy was unreasonable. *People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007). Counsel may have chosen not to spend time on these minute details to avoid jury confusion. Further, counsel may have strategically chosen not to emphasize these points because they were essentially irrelevant to defendant's guilt. Defendant could have easily changed his cap or clothes in the three hours between when Smith saw him and the shooting. And, whether the gun that killed Barnes was fired 10 or 11 times was of limited relevance. Defense counsel was not ineffective for failing to highlight these details.

Third, defendant argues that counsel was ineffective for failing to impeach Smith regarding her testimony about the color of defendant's vehicle and the color of the car she saw on the day of the shooting. Defendant argues he was prejudiced by this failure because the prosecutor used Smith's testimony to paint an inaccurate picture of the relevant events.

Defendant mischaracterizes Smith's testimony and his counsel's actions. Smith unequivocally testified that although she had been in defendant's truck before, she could not remember the color, other than that it was "two-tone." She reiterated this statement on cross-examination. Thus, defense counsel began to explore the truck's color, but apparently backed away from the issue as Smith was unequivocal that she could not recall the color of defendant's truck versus the color of the truck she saw on the day of the shooting. How to question witnesses is presumed to be a matter of trial strategy, *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008), and, having reviewed the record, we cannot conclude that counsel's cross-examination in this regard was unreasonable.

Fourth, defendant argues that counsel was ineffective for failing to adequately prepare for the cross-examination of Nelson. Specifically, defendant argues that counsel lacked the necessary documents needed to impeach Nelson, seemed unsure, made long pauses, and did not pay attention while the prosecution examined Nelson. He further argues that the jury witnessed these actions, which prejudiced his defense because the jury did not take defense counsel seriously. However, there is no evidence in the record to support defendant's allegations. Counsel conducted cross- and recross-examinations of Nelson. The fact that these examinations were apparently unable to sway the jury does not render them constitutionally ineffective.

Finally, defendant cannot demonstrate that there is a reasonable probability that the outcome of the trial would have been different if not for defense counsel's allegedly deficient performance, even were we to accept all of defendant's allegations as true. Essentially, the sole issue before the jury was Nelson's credibility. Nelson saw defendant shoot at Barnes once, Nelson himself was shot by defendant, Nelson ran away as he heard multiple gunshots, and, later, Barnes was found dead at the scene. Even if defense counsel had impeccably cross-examined Nelson, it would have been difficult for a jury to disregard Nelson's testimony,

especially considering the dearth of evidence to contradict Nelson's account. On this basis, defendant simply cannot sustain that he is entitled to a new trial on the basis of ineffective assistance of counsel. See *People v Trakhtenberg*, 493 Mich 38, 56; 826 NW2d 136 (2012) (discussing that where there is greater evidence of guilt, the magnitude of the errors necessary for a finding of prejudice is greater).

Affirmed.


/s/ Henry William Saad
/s/ Michael J. Kelly
/s/ Douglas B. Shapiro